Opinion to: SJR TGT SN TJ EVK ERA GCH LCH JB














Opinion issued October 19,
2006






 

 

 

 

 













 

     

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-05-00753-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



QUALITY INFUSION CARE, INC., Appellant

 

V.

 

HEALTH CARE SERVICE CORPORATION D/B/A BLUE CROSS AND
BLUE SHIELD OF TEXAS, A DIVISION OF HEALTH CARE SERVICE CORPORATION, AND
SOUTHWEST TEXAS HMO, INC. D/B/A HMO BLUE TEXAS, Appellees

 

 



On Appeal from the 152nd District Court

Harris County, Texas








Trial Court Cause No. 2003-14561

 

 



O P I N I O N

 

          In
this contract dispute, the trial court rendered judgment in favor of appellees,
Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Texas
(“BCBSTX”) and Southwest Texas HMO, Inc. d/b/a HMO Blue Texas (“HMO Blue”),
after a bench trial.  Quality Infusion
Care, Inc. (“QIC”) appeals, contending that the trial court misconstrued both
the meaning of the contractual term “provider” and the payment provisions of
the contract, and therefore erred in concluding that it—rather than
appellees—breached the contract.  QIC
further contends the trial court erred in awarding appellees their attorney’s
fees.  In addition, QIC asserts the trial
court erred in granting a no-evidence summary judgment for appellees on its
claims for fraud, fraudulent inducement, negligent misrepresentation, and
tortious interference with existing and prospective business relations.  We modify the trial court’s judgment and
affirm.

BACKGROUND

          QIC
provides infusion therapy services, such as chemotherapy, to patients who are
seriously ill.  In March 2002, QIC
contracted with BCBSTX to provide home infusion therapy services to patients
who are subscribers of various health insurance plans administered by BCBSTX
and its affiliates, including HMO Blue.  The
contract, which became effective June 1, 2002, requires QIC to obtain
precertification from BCBSTX before providing infusion therapy services to a
particular subscriber.  Following
treatment, QIC must submit its claims for payment at the rates specified in an
exhibit attached to the contract (the “Exhibit A rates”).

          In
May 2002, one month before the contract became effective, and again in July
2002, appellees advised QIC in writing that they did not recognize QIC as a
“network” provider.  As a result, appellees
refused, in many instances, to precertify QIC’s provision of infusion therapy
services to subscribers whose health care coverage does not include “out-of-network”
benefits.  Though it failed to obtain
precertification, QIC nonetheless administered treatment to several of these
subscribers and subsequently submitted claims to appellees for payment.  Following appellees’ refusal to pay, QIC
brought suit, alleging fraud, fraudulent inducement, constructive fraud,
negligent misrepresentation, tortious interference with existing and
prospective business relations, breach of contract, and promissory estoppel.

          In
the meantime, as the result of an audit, appellees learned that they had
overpaid several claims submitted by QIC. 
In accordance with a contractual provision requiring QIC to reimburse
appellees for any overpayments, appellees tendered their reimbursement claim to
QIC.  Following QIC’s refusal to pay,
appellees counterclaimed for breach of contract.

          After
granting appellees’ no-evidence summary judgment motion on QIC’s claims for
fraud, fraudulent inducement, constructive fraud, negligent misrepresentation,
and tortious interference with existing and prospective business relations, the
trial court held a bench trial on QIC’s remaining claims for breach of contract
and promissory estoppel.  The parties
submitted the case on an agreed stipulation of facts and stipulated
exhibits.  In pertinent part, the
stipulation of facts provides as follows:

          2.  The only contract that is a subject of this
cause became effective on June 1, 2002 and its termination was effective on
June 6, 2003 . . . .  There are two
slightly different versions of the contract attached to the Agreed Exhibit List
as Exhibit 1 and Exhibit 1A.  If the
dispute between these two versions of the Contract should prove material to the
Court’s decision, the evidence the Court can use to resolve that dispute is
[found in certain exhibits].

 

          3.  . . . QIC provided home infusion
pharmaceuticals and home infusion therapy services under the Contract to
patients who were covered under medical insurance plans administered by BCBSTX
and HMO Blue.

 

          4.  The patients whose claims that are the
subject of QIC’s only remaining cause of action for breach of the contract and
the counterclaim of BCBSTX and HMO Blue are identified in the documents
attached as Exhibits 2 and 3 to the Agreed Exhibit
List. . . .  The parties agree the Patient names,
dates of service, codes, Exhibit A rates, billed charges, amounts paid, payment
dates, and patient share figures in Exhibits 2 and 3 are true and correct.

 

          5.  Various hospitals such as Texas Childrens’
Hospital, doctors, and medical clinics referred the Patients to QIC with
prescriptions for infusion pharmaceuticals and infusion therapy.  QIC did make calls to obtain precertification
from BCBSTX and HMO Blue to administer pharmaceuticals and infusion therapy to
the Patients.  In some instances BCBSTX
and HMO Blue gave QIC precertification, and in some instances they refused to
give precertification.

 

          6.  HMO Blue maintains a network of providers who
provide services to HMO Blue patients. 
For HMO Blue patients who had no out-of network benefits, HMO Blue would
usually not precertify services by providers that HMO Blue did not recognize as
a provider within its network if there was a provider in the network that
provided the same services.  There were
several home infusion therapy providers in HMO Blue’s “Houston
network.”  Although the Contract refers
to QIC as a “Provider,” HMO Blue did not recognize QIC as one of its “network”
providers.  In fact, QIC was advised in
writing that it was not a “network” provider for the HMO Blue “Houston
network” in May 2002 and again in July 2002.

 

          7.  BCBSTX also maintains a managed care
“network” of providers in Houston for subscribers of its
PPO plans.  In some of these PPO plans,
the subscribers have no out-of network benefits.  For those BCBSTX PPO patients who had no
out-of-network benefits, BCBSTX would usually not precertify services by
providers that BCBSTX did not recognize as a provider within its Houston PPO
network, if there was a provider in the network that provided the same
services.  There were several home
infusion therapy providers in BCBSTX’s “Houston PPO network”.  Although the Contract refers to QIC as a
“Provider”, BCBSTX did not recognize QIC as one of its “network” providers.  In fact, QIC was advised in writing that it
was not a “network” provider for the BCBSTX “Houston PPO network” in May 2002
and again in July 2002.

 

          8.  HMO Blue did not give QIC precertification
for its services that it provided to the following HMO Blue members: [patients
are listed], because HMO Blue’s records showed that none of these HMO Blue
members had “out-of network” benefits on the respective dates of service . . .
.  BCBSTX did not give QIC
precertification for its services that it provided to the following BCBSTX PPO
members: [patients are listed], because BCBSTX’s records showed that neither of
these BCBSTX PPO members had “out-of-network” benefits on the respective dates
of service . . . .

 

          9.  For the claims QIC submitted that are
reflected on [the agreed exhibits], . . . QIC administered the pharmaceuticals
it billed for and provided the infusion therapy services it billed for, and
those pharmaceuticals and services were administered as prescribed by the
Patients’ referring doctor and were medically necessary.  QIC billed BCBSTX and/or HMO Blue its
standard retail rates for its infusion pharmaceuticals and infusion therapy
services provided to the Patients.  QIC’s
standard retail price for infusion pharmaceuticals was three times the Average
Wholesale Price (“AWP”).

 

          10.  Of the amounts billed on [a particular
patient], BCBSTX paid the . . . standard retail price QIC billed for its
services [on several occasions].

 

          . . . .

 

          12.  QIC received notice from BCBSTX about the
results of a Concentra Audit that showed overpayments on prior claims submitted
by QIC to BCBSTX.

 

          After
hearing argument, the trial court rendered judgment that QIC take nothing on
its claims, that BCBSTX recover damages in the amount of $26,044.68 plus
interest, that HMO Blue recover damages in the amount of $16,201.66 plus interest,
and that appellees recover their reasonable attorney’s fees.  In a separate instrument, the trial court
entered findings of fact and conclusions of law.  In pertinent part, the trial court found as
follows:

          1.       On June 1, 2002, [QIC] entered into a
contract with [BCBSTX].  This contract
involved providing home infusion therapy services to patients who were
subscribers of BCBSTX and/or its affiliates, including [HMO Blue].  This contract was terminated effective June
6, 2003.

 

          2.       BCBSTX and HMO Blue maintain networks of
providers who provide services to patients who are subscribers or members of
their managed care products in Houston, Texas.  For those patients who had no “out-of network
benefits”, BCBSTX and HMO Blue would usually not precertify services by
providers that BCBSTX and HMO Blue did not recognize as a provider within their
respective managed care networks, if there was a provider in their respective
managed care networks that provided the same services.  There were several home infusion therapy
providers in BCBSTX and HMO Blue’s managed care “Houston
networks.”  Although the Contract refers
to QIC as a “Provider,” BCBSTX and HMO Blue did not recognize QIC as one of
their managed care “network” providers. 
In fact, QIC was advised in writing by BCBSTX that it was not a managed
care “network” provider for the BCBSTX and HMO Blue “Houston
networks” in May 2002 and again in July 2002.

 

          3.       QIC never signed the agreements required
for BCBSTX and HMO Blue managed care “Houston networks”.  QIC never agreed to accept the discounted
rates “network providers” in these managed care networks accept for the
services they provide to patients who are members or subscribers of these
managed care networks.

 

          4.       Under its contract, QIC could only
provide “Covered Services” to subscribers of the Defendants.  QIC’s services were “Covered Services” only
if the patient’s health care coverage provided a benefit for the home infusion
therapy services provided by QIC.  If a
patient was a member or subscriber of the HMO Blue “Houston Network” or the
BCBSTX PPO “Houston Network”, and the patient’s coverage provided no “out-of
network” benefits, any services QIC provided to that patient were not “Covered
Services”.

 

          5.       QIC was also required under the contract
to obtain precertification of its services from BCBSTX and/or HMO Blue as a
condition precedent to payment under its contract.  HMO Blue did not give QIC precertification
for its services that it provided to the following HMO Blue members: [patients
are listed], because HMO Blue’s records showed that none of these HMO Blue
members had “out-of network” benefits on the respective dates of service . . .
.  BCBSTX did not give QIC precertification
for its services that it provided to the following BCBSTX PPO members:
[patients are listed], because BCBSTX’s records showed that neither of these
BCBSTX PPO members had “out-of-network” benefits on the respective dates of
service . . . .

 

          6.       With the exception of some overpayments,
BCBSTX paid the claims QIC submitted for [patients are listed] at the rates
specified in Exhibit A of QIC’s contract. 
The overpayments made by BCBSTX to QIC on these claims total $5497.69.

 

          7.       BCBSTX overpaid most of the claims QIC
submitted for [a particular patient] after QIC submitted “corrected claims”
that changed the number of units/days of a drug, Neupogen, from 10 to 30.  [The patient]’s physician had ordered that
she receive 300 mcg of Neupogen for 10 days at a time.  As a result of this error, BCBSTX overpaid
QIC $20,546.99 on the “corrected” claims . . . .

 

          . . . .

 

          9.       . . . BCBSTX . . . notified QIC of
overpayments it had previously made that were identified in the Concentra
audit.

 

          10.     BCBSTX did not pay any of the claims QIC
submitted for [patients are listed], because QIC did not obtain and could not
have obtained precertification of the services it provided to these patients
who had no “out-of network” benefits.

 

          11.     HMO Blue did not pay any of the claims QIC
submitted for [patients are listed], because QIC did not obtain and could not
have obtained precertification of the services it provided to these patients
who had no “out-of-network” benefits.

 

          12.     With the exception of two claims, HMO Blue
did not pay any of the claims QIC submitted for [a particular patient], because
QIC did not obtain and could not have obtained percertification of the services
it provided to [the patient], since he also had no “out-of network”
benefits.  HMO Blue erroneously paid two
of the claims submitted by QIC more than one year after the contract terminated
when QIC filed a complaint.  The
overpayments on these two claims total $14,650.60.

 

          13.     With the exception of one claim it
overpaid, HMO Blue paid the claims QIC submitted for [a particular patient] at
the rates specified in Exhibit A of QIC’s contract.  The overpayment HMO Blue made on one claim
QIC submitted for [the patient] was $1551.06.

 

In pertinent part, the trial court
concluded as follows:

          2.       QIC’s contract with BCBSTX dated June 1,
2002 did not give QIC any rights as a “network provider” in either the managed
care “Houston networks” of either BCBSTX or HMO Blue.

 

          3.       Under its contract with BCBSTX, QIC was
only entitled to be paid for “Covered Services” it provided to subscribers and
members of BCBSTX and HMO Blue.  If a
particular patient’s coverage with BCBSTX and/or HMO Blue provided no benefits
for “out-of-network” benefits, any services QIC provided to such a patient were
not “Covered Services” and QIC was entitled to no payment for the services it
provided to such a patient.

 

          4.       Under its contract with BCBSTX, QIC was
also required to obtain precertification of its services as a condition
precedent to payment.  If QIC could not
obtain precertification of its services, because the patient had no “out-of
network” benefits, QIC was not entitled to be paid for the services it rendered
to such a patient.

 

          5.       QIC was not entitled to be paid by HMO
Blue for the services it rendered to [patients are listed]; because these
patients had no “out-of-network” benefits, QIC was not a “network provider” in
HMO Blue’s managed care “Houston network”, these services were not “Covered
Services” under the contract, and QIC did not obtain precertification from HMO
Blue for the services it provided to these patients.

 

          6.       QIC was not entitled to be paid by BCBSTX
for the services it rendered to [patients are listed]; because these patients
had no “out-of-network” benefits, QIC was not a “network provider” in BCBSTX’s
managed care “Houston network”, these services were not “Covered Services”
under the contract, and QIC did not obtain precertification from BCBSTX for the
services it provided to these patients.

 

          7.       The rates specified in Exhibit A of QIC’s
contract with BCBSTX applied to all claims QIC submitted for “Covered Services”
to either BCBSTX or HMO Blue.  Although
its contract with BCBSTX required QIC to bill for its services at its retail
rates, Articles 2 and 6 of the contract clearly identify Exhibit A attached to
the contract as the reimbursement mechanism for QIC’s services under the
contract.  It is also clear under Article
6 that neither BCBSTX nor HMO Blue nor the patients who received “Covered
Services” from QIC were liable for payment of a sum based on charges made in
excess of the rates specified in Exhibit A of the contract.

 

          8.       Exhibit A of the contract specifies rates
for particular infusion therapy services provided by QIC.  Exhibit A also states that QIC shall be
reimbursed for drugs its [sic] provides at the AWP for the drug.  QIC was not entitled to be paid for the
“Covered Services” it provided under the contract at any rates in excess of
those specified in Exhibit A of the contract, and QIC was not entitled to be reimbursed
for the drugs its [sic] provided at any rate more than the AWP of the
particular drug.

 

          9.       With the exception of some overpayments,
BCBSTX correctly paid QIC for the “Covered Services” it provided to [patients
are listed].

 

          . . . .

 

          11.     BCBSTX overpaid the claims QIC submitted
for [a particular patient], because it paid these claims at rates in excess of
the rates specified by Exhibit A of the contract.  The amount of these overpayments was
$20,546.99.  BCBSTX also made
overpayments totaling $5497.69 on the claims QIC submitted for [patients are
listed].  BCBSTX is entitled to recover
all of these overpayments, totaling $26,044.68[,] from QIC under Article 6D of
the contract.

 

          12.     With the exception of one overpayment, HMO
Blue . . . correctly paid QIC for the “Covered Services” it provided to [a
particular patient] at the rates specified in Exhibit A of the contract.  The single overpayment . . . was in the
amount of $1551.06, and HMO Blue is entitled to recover it from QIC under
Article 6D of the contract.

 

          13.     HMO Blue also paid two claims QIC submitted
on [a particular patient] in error.  [He]
did not have “out-of-network” benefits and the services QIC provided to him
were not “Covered Services” under the contract. 
The erroneous payments HMO Blue made on these two claims total
$14,650.60, and HMO Blue is entitled to recover these overpayments from QIC
under Article 6D of the contract.

 

          14.     Neither BCBSTX nor HMO [Blue] breached
QIC’s contract with BCBSTX.  Accordingly,
QIC takes nothing on all its claims seeking affirmative relief in this cause.

 

          15.     BCBSTX is entitled to recover the sum of
$26,044.68 from QIC for the overpayments it made to QIC under the contract, and
HMO Blue is entitled to recover the sum of $16,201.66 from QIC for the
overpayments it made to QIC under the contract.

 

          On
appeal, QIC contends that no evidence supports the trial court’s conclusion
that the contract does not give QIC any rights as a “network provider” in
appellees’ Houston managed care networks, or, alternatively, that this
conclusion is against the great weight and preponderance of the evidence.  Hence, QIC maintains, the trial court also
erred in concluding that QIC is not entitled to payment for the infusion
therapy services it provided to subscribers who do not have out-of-network benefits.  With respect to the services it provided to
those subscribers who have out-of-network benefits, QIC contends the
trial court erred in concluding that appellees properly paid QIC at the rates
specified in Exhibit A to the contract, rather than at QIC’s standard retail
rates.  QIC further contends there is no
evidence, or insufficient evidence, to support the trial court’s conclusion
that QIC breached the contract by failing to reimburse appellees for the overpayments
they made to QIC.  In addition, QIC
asserts that the trial court erred in awarding appellees their attorney’s fees
under Civil Practice and Remedies Code section 38.002 because there is no
evidence that appellees presented their claim to QIC under subsection (2) of
the statute.  See Tex. Civ. Prac. & Rem. Code Ann.
§ 38.002(2) (Vernon
1997).  Finally, QIC contends the trial
court erred in granting a no-evidence summary judgment for appellees on its
claims for fraud, fraudulent inducement, negligent misrepresentation, and
tortious interference with existing and prospective business relations, because
it presented more than a scintilla of evidence to support every element of each
of these claims.

 

ANALYSIS

Bench Trial

Standard of Review

          In an appeal
from a bench trial, a trial court’s findings of fact have the same weight as a
jury’s verdict.  Amador v. Berrospe,
961 S.W.2d 205, 207 (Tex. App.—Houston [1st Dist.] 1996, writ denied).  When challenged, findings of fact are not
conclusive if, as here, there is a complete reporter’s record.  Id.  When there is a reporter’s record, the trial
court’s findings of fact are binding only if supported by the evidence.  Id.  If the findings are challenged, we review the
sufficiency of the evidence supporting the findings by applying the same
standards that we use in reviewing the legal or factual sufficiency of the
evidence supporting jury findings.  Catalina
v. Blasdel, 881 S.W.2d 295, 297 (Tex.
1994).

          The
test for legal sufficiency is “whether the evidence at trial would enable
reasonable and fair-minded people to reach the verdict under review.”  City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  In making this determination, we credit
favorable evidence if a reasonable fact-finder could, and disregard contrary
evidence unless a reasonable fact-finder could not.  Id.  So long as the evidence falls within the zone
of reasonable disagreement, we may not substitute our judgment for that of the
fact-finder.  Id. at 822.  The trier of fact is the sole judge of the
credibility of the witnesses and the weight to give their testimony.  Id.
at 819.  Although we consider the evidence
in the light most favorable to the challenged findings, indulging every
reasonable inference that supports them, we may not disregard evidence that
allows only one inference.  Id. at 822.

          In
reviewing a factual sufficiency point, we consider all the evidence supporting
and contradicting the finding.  Plas-Tex,
Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989). 
We set aside the verdict only if the finding is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.  Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).  In a bench trial, the trial court, as fact-finder,
is the sole judge of the credibility of the witnesses.  Sw. Bell Media, Inc. v. Lyles, 825
S.W.2d 488, 493 (Tex. App.—Houston [1st Dist.] 1992, writ denied).

          We
review de novo a trial court’s conclusions of law, and uphold them on appeal if
the judgment can be sustained on any legal theory supported by the
evidence.  BMC Software Belgium v.
Marchand, 83 S.W.3d 789, 794 (Tex. 2002); In
re Moers,
104 S.W.3d 609, 611 (Tex. App.—Houston
[1st Dist.] 2003, no pet.).  An appellant
may not challenge a trial court’s conclusions of law for lack of factual
sufficiency, but we review the legal conclusions drawn from the facts to
determine their correctness.  BMC
Software Belgium,
83 S.W.3d at 794.

QIC’s Breach of Contract Claim

          QIC
challenges nearly all of the trial court’s findings of fact and conclusions of
law on the ground that they “cannot support the trial court’s judgment that QIC
take nothing on its breach of contract claim.”[1]  As all
of QIC’s arguments relate to whether the trial court properly interpreted
various provisions of the contract, we turn now to an examination of the contractual
language at issue.

1.       The
Contractual Term “Provider”

The contract states as follows:

Home Infusion Therapy Provider Contract

 

This Contract is between
Blue Cross and Blue Shield of Texas, . . . hereinafter called BCBSTX, and
Quality Infusion Care, a Home Infusion Therapy Provider located in [H]arris County,
 Texas, hereinafter called the
Provider.

 

QIC asserts that “a plain reading of the
Contract shows that the term ‘Provider’, as used in the Contract, can only mean
‘in-network provider’.”  Appellees
maintain that the parties did not intend for the term “Provider” to mean
“in-network provider,” as evidenced by two letters appellees sent to QIC
advising it that it is not a network provider.

          In
construing a written contract, our primary concern is to ascertain the true
intent of the parties as expressed in the instrument.  Nat’l Union Fire Ins. Co. v. CBI Indus.,
Inc., 907 S.W.2d 517, 520 (Tex.
1995).  We examine the entire writing in
an effort to harmonize and give effect to all of its provisions so that none
will be rendered meaningless.  Coker
v. Coker, 650 S.W.2d 391, 393 (Tex.
1983).  If a written contract is so
worded that it can be given a definite or certain legal meaning, then it is not
ambiguous, and we construe the contract as a matter of law.  Id.  On the other hand, a contract is ambiguous if
its meaning is uncertain and doubtful, or if it is susceptible to more than one
reasonable interpretation.  Nat’l Union, 907 S.W.2d at
520; Coker, 650 S.W.2d at 393. 
Whether a contract is ambiguous is a question of law.  Gulf Ins. Co. v. Burns Motors, Inc.,
22 S.W.3d 417, 423 (Tex.
2000).  If a contract is determined to be
ambiguous, then a court may consider extraneous evidence to ascertain the true
meaning of the instrument.  Nat’l Union, 907 S.W.2d at
520.

          An
ambiguity in a contract may be either “patent” or “latent.”  Id.  A patent ambiguity is evident on the face of
the contract.  Id. 
A latent ambiguity arises when a contract that is unambiguous on its
face is applied to the subject matter with which it deals and an ambiguity
appears by reason of some collateral matter. 
Id.  When a contract contains an ambiguity, either
patent or latent, the interpretation of the instrument becomes a fact
issue.  Coker, 650 S.W.2d at 394.  The trier of fact must resolve the ambiguity
by determining the true intent of the parties. 
Id.
at 394–95.

          This
case involves the meaning of the contractual term “Provider.”  QIC urges that “Provider” means “in-network
provider”; appellees maintain that “Provider” means simply “provider”—not “network
provider.”  When the contracting parties
set forth their own definitions of the terms they employ, we are not at liberty
to disregard those definitions and substitute other meanings.  Healthcare Cable Sys., Inc. v. Good
Shepherd Hosp., Inc., 180 S.W.3d 787, 791 (Tex. App.—Tyler 2005, no pet.).  Here, however, the parties did not define the
term “Provider.”  Nor do any of the
contractual provisions shed light on the meaning of the term.[2]  The
contract employs the term “Provider” throughout and simply does not contemplate
a distinction between “provider” and “network provider.”

Thus, after carefully reviewing the contract, we
conclude that the term “Provider” is latently ambiguous.  Though the term does not appear ambiguous on its
face, “[a]pplying the [“Provider”] language to the context of the claim[s] here . . . produce[s]
an uncertain or ambiguous result,” because the term is “fairly susceptible of
more than one construction.”  Nat’l Union, 907 S.W.2d at 521; Healthcare Cable,
180 S.W.3d at 792.  “Provider” could mean
“in-network provider,” as QIC contends, or it could mean simply “provider,”
without bestowing on QIC the additional status of “network provider,” as
appellees contend.  Based on the language
employed, neither QIC’s interpretation of the contract nor that of appellees is
any less reasonable.  Healthcare Cable,
180 S.W.3d at 792.

          Given
this latent ambiguity in the contract, the question of the proper construction
of the term became one for the trier of fact—here, the trial court.  Coker, 650 S.W.2d at 394–95.  To determine the meaning of the term
“Provider,” the trial court looked to several items of extrinsic evidence.  See Nat’l Union, 907 S.W.2d at 520
(noting that, upon determination that contract is ambiguous, court may consider
extrinsic evidence to determine true meaning of contract).

First, the court observed that “QIC was advised
in writing by BCBSTX that it was not a managed care ‘network’ provider for the
BCBSTX and HMO Blue ‘Houston networks’ in May
2002 and again in July 2002.”  The
contract became effective June 1, 2002.  The
stipulated exhibits show that, in May 2002, and again in July 2002, appellees
sent letters to QIC advising it that it is not a network provider.  Thus, QIC was on notice one month before the
contract became effective (and again one month after it became effective) that
appellees did not consider QIC to be a network provider.  In fact, QIC stipulated that, “[a]lthough the
Contract refers to QIC as a ‘Provider,’ HMO Blue [and BCBSTX] did not recognize
QIC as one of [their] ‘network’ providers.”

The trial court also observed that “QIC never
signed the agreements required by BCBSTX and HMO Blue [for their] managed care
‘Houston networks[,]’” and “never agreed to accept the discounted rates
‘network providers’ in these managed care networks accept for the services they
provide to patients who are members or subscribers of these managed care
networks.”  The stipulated exhibits demonstrate
that appellees require network providers to sign a contract different from the
one that QIC signed.  QIC’s contract
includes Exhibit A, which sets forth a “fee schedule” for QIC’s services.  A column entitled “Traditional Allowed” lists
the rates appellees will use in compensating QIC for its services.  In contrast, the “network contract”—a
document QIC did not sign—has a different fee schedule entirely.  Specifically, appellees compensate their network
providers in accordance with the lower rates set forth in a column entitled
“Managed Care Allowed.”  The stipulated
exhibits reveal that, in 1999, QIC declined to become a network provider.  As the July 2002 letter to QIC states, “In
August 1999, we did offer a [network] contract to your company, but the
previous owner declined it.  They felt
the rates were too low and they saw not [sic] benefit to contracting with us
for that product.  The proposed [network]
agreements were never returned.”  This
evidence is sufficient to support the trial court’s conclusion that the parties
did not intend for the term “Provider” to mean “in-network provider.”

QIC urges that appellees are “estopped from
contending that QIC is not an ‘in-network provider’ because they have
specifically recognized QIC as an ‘in-network provider’ by paying QIC’s claims
submitted for patient’s [sic] that BCBSTX and HMO Blue claim had no ‘out-of-network’
benefits.”  Though QIC correctly states
that appellees paid some of the claims QIC submitted for subscribers who
do not have out-of-network benefits, appellees did not consistently do so.  To the contrary, appellees rejected numerous
claims for subscribers who do not have out-of-network benefits.[3] 
Moreover, the contract expressly contemplates that appellees might pay
claims in error on occasion, as evidenced by Article 6D: “In the event of any
overpayment, duplicate payment, or other payment in excess of that to which the
Provider is entitled, the Provider agrees to make repayment to BCBSTX within
thirty (30) days of notification by BCBSTX of such overpayment, duplicate payment
or other excess payment.”

The Texas Supreme Court rejected a similar
estoppel argument in Sun Oil Co. (Delaware)
v. Madeley, 626 S.W.2d 726, 733–34 (Tex.
1981).  In that case, appellants argued
that Sun Oil Company’s conduct in sharing proceeds from working interest gas
with appellants for over forty years “create[d] an estoppel against Sun to
assert, at this late date, a construction different from the mutual
construction of the parties.”  Id.  The
supreme court rejected this argument, holding that estoppel “does not create a
contract right that does not otherwise exist.” 
Id. at 734.  We likewise conclude that appellees’ occasional
payment of claims for subscribers with no out-of-network benefits does not
entitle QIC to assert a right under the contract to be paid as an in-network
provider.  Accordingly, we reject QIC’s
estoppel argument, particularly because the contract contemplates that such
payments may occur due to error.[4]

In sum, we conclude, as a matter of law, that
the contractual term “Provider” is latently ambiguous.  As such, the trial court properly considered
extrinsic evidence relating to the parties’ intent in employing the term in
their contract.  Moreover, the evidence
is sufficient to support the trial court’s factual determination that
“Provider” does not mean “network provider.” 
Hence, we conclude that the contract does not make QIC an in-network
provider, and we hold that the trial court’s findings of fact and conclusions
of law incorporating this interpretation of the contract are supported by
substantial evidence.

2.       Contractual
Precertification

QIC contends appellees breached the contract by refusing to
precertify QIC’s proposed treatments for several patients.[5]  Our conclusion that
QIC is not a network provider is dispositive of this issue.

Article 4 of the contract provides as follows:

ARTICLE
4 – Precertification for Treatment

 

A.                                      
Precertification is the
process by which the medical necessity of Covered Services is approved or
denied in advance.

 

B.                                       
The Provider shall
precertify Covered Services listed on the attached Exhibit(s) for each
Subscriber as a condition precedent to payment of a claim.  The Provider shall submit to BCBSTX a
treatment plan for each Subscriber seeking Covered Services.

 

C.                                      
While precertification
is not an assurance or guarantee of payment, it does mean that BCBSTX will not
deny a claim on the basis of medical necessity.

 

The contract defines “Covered Services” and “Subscriber” as
follows:

          ARTICLE 1 – Definitions

 

A.              
Covered Services means
those home infusion therapy services for which benefits are available under a
Subscriber’s health care coverage.

 

B.               
Subscriber means any
person entitled to receive Covered Services under health care coverage provided
or administered by (1) BCBSTX, (2) a Blue Cross and/or Blue Shield Plan of
another state, (3) an affiliate of HCSC [Health Care Service Corporation] or
(4) a subsidiary of a Blue Cross and/or Blue Shield Plan of another state.  The phrase “provided or administered” includes
an insurance arrangement, an administrative services agreement, or an
arrangement whereby an employer or welfare benefit plan or any third party
payor contracts with BCBSTX to utilize providers that have contracted with
BCBSTX.  The term “affiliate” includes,
but is not limited to, any entity in which HCSC has an ownership interest.

 

          QIC maintains
that, because appellees stipulated all of the services QIC provided to the
patients at issue were medically necessary, appellees breached the contract by
wrongfully refusing to precertify treatments for particular patients.  QIC correctly asserts that precertification
involves a consideration of “medical necessity”; however, as QIC acknowledges
in its brief, precertification applies only to “Covered Services.”

The contract defines “Covered Services” as “those home
infusion therapy services for which benefits are available under a Subscriber’s
health care coverage.”  Thus, by the
plain terms of the contract, if a particular subscriber’s health care coverage
does not include out-of-network benefits, then a service provided by an
out-of-network provider, no matter how medically necessary that service may be,
does not qualify as a “Covered Service,” and therefore is not eligible for
precertification.  Given our determination
that QIC is not a network provider, appellees properly refused to precertify
QIC’s proposed treatments for subscribers who do not have out-of-network
coverage.  QIC admits as much by
premising its arguments regarding precertification on the presumption that it
is an in-network provider.  We have
determined that it is not.  Accordingly,
we reject QIC’s argument that appellees breached the contract by refusing to
precertify infusion therapy services for patients who do not have
out-of-network coverage.[6]

3.       Contractual
Payment Provisions

Though several of the claims at issue in this case
involve patients who do not have out-of-network coverage, other claims involve
patients with out-of-network coverage. 
Thus, we turn to QIC’s contention that appellees breached the contract
by failing to compensate QIC at its “standard retail rates” for the services it
provided to those patients with out-of-network coverage.

The payment provisions of the contract provide
as follows:

ARTICLE 2 – Schedule of Reimbursement

 

A.      The reimbursement
mechanism which will be used as the basis for payment of Covered Services by
BCBSTX to the Provider is a part of the Contract and will be as described in
the Exhibit(s) attached to this Contract.

 

ARTICLE 5 – Billing

 

A.      As soon as possible after
providing Covered Services to a Subscriber holding health care coverage, the
Provider shall furnish to BCBSTX a claim for services furnished such Subscriber
. . . .

 

ARTICLE 6 – Payment of Benefits

 

A.              
BCBSTX will,
following receipt of itemized statements in complete and accurate form, pay to
the Provider the amount of its obligation under the Subscriber’s health care
coverage.  When submitting charges under
the Contract, the Provider shall bill BCBSTX its standard retail price (i.e.,
the highest price the Provider bills any other carrier) for the service(s)
rendered.  The Provider will base the
Subscriber’s share of the cost on the Provider’s standard retail price or the
BCBSTX allowable amount as set forth in the Exhibit(s), whichever is less.

 

B.               
Neither
BCBSTX nor the Subscriber shall be liable for payment of (1) any sum based upon
charges made at rates in excess of those stipulated in the attached Exhibit(s)
or (2) initial services or continued services for which the Provider did not
obtain precertification/recertification.

 

The “attached Exhibit” to which the contract
refers is Exhibit A, a “List of IV Services with Attached Fee Schedule.”  As already discussed, the “Attached Fee
Schedule” is a chart setting forth the “Traditional Allowed” amount for the various
infusion therapy services QIC provides. 
Exhibit A specifies that “[e]ach drug dispensed in conjunction with a
therapy listed on the attached fee schedule will be reimbursed at AWP [average
wholesale price].”  Exhibit A also
reiterates that,

[w]hen submitting charges under this Exhibit A, the Provider will
bill HMO Blue Texas its standard retail price (i.e., the highest price the
Provider bills any other carrier) for the service(s) rendered.  The Provider will base the Subscriber’s share
of the cost on the Provider’s standard retail price or the BCBSTX allowable
amount as set forth in this Exhibit, whichever is less.[7]

 

          QIC
contends that Article 6A and Exhibit A “specifically allow QIC to bill and be
paid its standard retail price,” and the trial court erred in concluding
otherwise.[8]  We
disagree.  Rather, we conclude, as a
matter of law, that the payment provisions of the contract are unambiguous and that
the trial court’s interpretation of them is correct.

          The
trial court concluded as follows:

          7.       The rates specified in Exhibit A of QIC’s
contract with BCBSTX applied to all claims QIC submitted for “Covered Services”
to either BCBSTX or HMO Blue.  Although
its contract with BCBSTX required QIC to bill for its services at its retail
rates, Articles 2 and 6 of the contract clearly identify Exhibit A attached to
the contract as the reimbursement mechanism for QIC’s services under the
contract.  It is also clear under Article
6 that neither BCBSTX nor HMO Blue nor the patients who received “Covered
Services” from QIC were liable for payment of a sum based on charges made in
excess of the rates specified in Exhibit A of the contract.

 

          8.       Exhibit A of the contract specifies rates
for particular infusion therapy services provided by QIC.  Exhibit A also states that QIC shall be
reimbursed for drugs its [sic] provides at the AWP for the drug.  QIC was not entitled to be paid for the
“Covered Services” it provided under the contract at any rates in excess of
those specified in Exhibit A of the contract, and QIC was not entitled to be
reimbursed for the drugs its [sic] provided at any rate more than the AWP of
the particular drug.

 

          The
trial court’s interpretation of the payment provisions of the contract is
correct as a matter of law.  That is, although
Article 6A and Exhibit A state that QIC “shall bill BCBSTX its standard
retail price,” the contract does not require appellees to pay QIC its
standard retail price.  (Emphasis
added).  To the contrary, Article 2A
states that the “reimbursement mechanism which will be used as the basis
for payment of Covered Services by BCBSTX to [QIC] is . . . described
in . . . Exhibit [A].” 
(Emphasis added).  Moreover, Article
6B expressly caps appellees’ liability: “BCBSTX . . . shall [not] be liable for
payment of . . . any sum based upon charges made at rates in excess of those
stipulated in . . . Exhibit[ A].”  Exhibit
A further states that “[e]ach drug dispensed in conjunction with a[n infusion]
therapy [service] will be reimbursed at AWP [average wholesale price],” not
QIC’s retail price.  These contractual
provisions plainly govern reimbursement—though QIC bills appellees according to
its standard retail price, appellees are not obligated to pay QIC anything more
than the rates set forth in Exhibit A.[9]  We
therefore reject QIC’s contention that it is entitled to be reimbursed at its
standard retail rates.

* * *

          The
contract requires appellees to compensate QIC for the “Covered Services” it
provides to appellees’ subscribers using the rates specified in Exhibit A.  Given our determination that the contract
does not make QIC an in-network provider, we conclude that appellees are not
obligated to reimburse QIC for the services it provided to subscribers who do
not have out-of-network benefits, as these services do not constitute “Covered Services”
under the contract.  Moreover, we
conclude that appellees properly reimbursed QIC at the Exhibit A rates for the
“Covered Services” it provided to those subscribers with out-of-network
coverage.  Accordingly, we affirm the
trial court’s judgment that QIC take nothing on its breach of contract claim.

Appellees’ Breach of Contract
Counterclaim

          QIC
contends the trial court erred in concluding that it breached the contract by
failing to return to appellees certain overpayments that they had made to QIC
under the contract.  QIC bases its
argument, in large part, on its contention that the contract makes it an
in-network provider, and that it is entitled to be reimbursed at its standard
retail rates.  As we have already determined
that the contract does not make QIC an in-network provider, and does not
entitle QIC to be paid its standard retail rates, we reject this portion of
QIC’s argument.

          QIC
alternatively contends “there is no evidence that BCBSTX and/or HMO Blue ever
notified QIC of such overpayments as required by Article 6D of the Contract.”  Article 6D states as follows: “In the event
of any overpayment, duplicate payment, or other payment in excess of that to
which the Provider is entitled, the Provider agrees to make repayment to BCBSTX
within thirty (30) days of notification by BCBSTX of such overpayment,
duplicate payment or other excess payment.” 
QIC stipulated, however, that it “received notice from BCBSTX about the
results of a Concentra Audit that showed overpayments on prior claims submitted
by QIC to BCBSTX.”  In light of its
stipulation that it received notice of the overpayments, we reject QIC’s
argument that there is no evidence of notice.

          The
overpayments at issue relate to certain claims for which appellees either (1)
made payments to QIC even though the subscribers at issue do not have
out-of-network benefits or (2) paid QIC using its standard retail rates rather
than the Exhibit A rates.[10]  Given
our conclusion that appellees are not contractually obligated to compensate QIC
for the services it provided to subscribers who do not have out-of-network
benefits, and are required only to pay QIC at the Exhibit A rates for the
services it provided to subscribers with out-of-network benefits, we hold that
QIC breached Article 6D of the contract by failing “to make repayment to BCBSTX
within thirty (30) days of notification by BCBSTX of such overpayment[s].”  Accordingly, we conclude that the trial court
properly found in favor of appellees on their breach of contract counterclaim.

The parties stipulated as to the Exhibit A
rates, the amounts QIC billed, and the amounts appellees paid for each of the
claims at issue.  Appellees point out,
however, that the stipulated exhibit contains an error regarding the
overpayment amounts for three subscribers.[11]  Rather
than stating that the overpayments for these three subscribers total $5497.69,
the exhibit should list the total as $2655.88. 
With this modification, we affirm the trial court’s judgment as it
relates to appellees’ counterclaim.  See
Tex. R. App. P. 43.2(b) (stating
that appellate court may modify trial court’s judgment and affirm it as
modified).

Attorney’s Fees

          QIC
contends the trial court erred in awarding appellees their attorney’s fees
under Civil Practice and Remedies Code section 38.002 because “there is no
evidence that [appellees’] claims for attorney’s fees were presented to QIC as
required by [subsection (2) of the statute].” 
QIC concedes that appellees’ counsel averred in his affidavit that he
tendered appellees’ counterclaim to QIC’s counsel in September 2003, but urges
that “[counsel]’s affidavit provides no other information or evidence relating
to this purported presentment, and therefore does not meet the presentment
requirements of § 38.002.”

          As
a general rule, each party bears the cost of its own attorney, absent a
contractual or statutory provision to the contrary.  Panizo v. Young Men’s Christian Ass’n of
the Greater Houston Area, 938 S.W.2d 163, 168 (Tex. App.—Houston [1st
Dist.] 1996, no writ).  Section 38.001(8)
of the Civil Practice and Remedies Code provides that a party may recover
reasonable attorney’s fees if its claim is for “an oral or written
contract.”  Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (Vernon 1997).  To
recover attorney’s fees under the statute, the claimant must comply with the
following requirements:

(1) the claimant must be represented by an attorney;

 

(2) the claimant must present the claim to the
opposing party or to a duly authorized agent of the opposing party; and

 

(3) payment for the just amount owed must not have
been tendered before the expiration of the 30th day after the claim is
presented.

 

Id. § 38.002(1)–(3).  Presentment of a claim under section 38.002(2)
is required to allow the entity against whom it is asserted an opportunity to
pay it before incurring an obligation for attorney’s fees.  Panizo, 938 S.W.2d at 168.  The act of filing suit does not, by itself,
constitute presentment.  Id.

          No
particular form of presentment is required—it may be written or oral.  Id.  “[A]ll that is necessary is that a party show
that its assertion of a debt or claim and a request for compliance was made to
the opposing party, and the opposing party refused to pay the claim.”  Standard Constructors, Inc. v. Chevron
Chem. Co., 101 S.W.3d 619, 627 (Tex. App.—Houston
[1st Dist.] 2003, pet. denied) (citing Panizo, 101 S.W.3d at 168).  Moreover, we construe the statute liberally
to promote its underlying purposes.  Tex. Civ. Prac. & Rem. Code Ann. §
38.005 (Vernon 1997).

          Here,
appellees’ counsel averred in his affidavit that he “tendered [his] clients[’]
counterclaim to Quality Infusion Care, Inc.’s attorney in September 2003.”[12]  This is sufficient evidence of presentment
under section 38.002(2).  See Panizo,
938 S.W.2d at 168–69 (holding “testimony of Panizo’s attorney [that he had
presented Panizo’s claim several times in writing to appellee’s attorney] established
that Panizo presented her contract claim”); Birdwell v. Texins Credit Union,
843 S.W.2d 246, 251 (Tex. App.—Texarkana 1992, no writ) (determining that
affidavit of appellant’s attorney satisfied presentment requirement of section
38.002 because it “allege[d] that after attempts to collect failed, a demand
letter was sent and not responded to, and then this suit was prepared and
filed”); see also Harrison v. Gemdrill Int’l, Inc., 981 S.W.2d 714, 719
(Tex. App.—Houston [1st Dist.] 1998, pet. denied) (holding appellant’s trial
testimony that, when he informed appellee of his resignation, he told appellee
he wanted to “collect his pay ‘without fail,’” constituted sufficient evidence
of presentment).[13]  We therefore affirm the trial court’s
judgment awarding appellees their reasonable attorney’s fees.

No-Evidence Summary Judgment

Standard of Review

          We
review the trial court’s ruling on a summary judgment motion de novo.  Provident Life & Accident Ins. Co. v.
Knott, 128 S.W.3d 211, 215 (Tex.
2003).  We view the evidence in a light
most favorable to the non-movant, making all reasonable inferences and
resolving all doubts in the non-movant’s favor. 
Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 222 (Tex. 1999).  Because
the summary judgment order does not specify the ground or grounds on which the
trial court relied for its ruling, we affirm the summary judgment if any of the summary judgment
grounds is meritorious.  FM Props.
Operating Co. v. City of Austin, 22 S.W.3d
868, 872–73 (Tex. 2000).

          Here,
appellees sought a no-evidence summary judgment.  In a no-evidence summary judgment, the movant
represents that no evidence exists as to one or more essential elements of the
non-movant’s claims, upon which the non-movant would have the burden of proof
at trial.  Tex. R. Civ. P.
166a(i); Jackson v. Fiesta Mart, 979 S.W.2d 68, 70–71 (Tex. App.—Austin
1998, no pet.).   On review, we ascertain whether the non-movant
produced more than a scintilla of probative evidence to raise a genuine issue
of material fact.  Id.
 More than a scintilla of evidence
exists if the evidence “rises to a level that would enable reasonable and
fair-minded people to differ in their conclusions.”  Merrell Dow Pharms., Inc. v. Havner,
953 S.W.2d 706, 711 (Tex. 1997).  If the evidence does no more than create a
mere surmise or suspicion of fact, less than a scintilla of evidence exists.  King Ranch, Inc. v. Chapman, 118
S.W.3d 742, 751 (Tex. 2003).  Although the non-moving party is not required
to marshal its proof, it must present evidence that raises a genuine fact issue
on each of the challenged elements.  Tex. R. Civ. P. 166a(i).

Tort Claims

          Prior
to the bench trial, appellees sought a no-evidence summary judgment on QIC’s
claims for fraud, fraudulent inducement, constructive fraud, negligent
misrepresentation, and tortious interference with existing and prospective business
relations.  QIC responded by presenting
the following evidence: (1) an affidavit from its president, James Rutherford;
(2) a copy of the contract with a transmittal letter; (3) claim forms for
several subscribers; (4) the July 2002 letter advising QIC that it is not a
network provider; (5) other pieces of correspondence; (6) a payment
spreadsheet; (7) a copy of a BCBSTX webpage listing QIC as a “provider”; and
(8) letters from appellees to two subscribers advising them that the request
for QIC to provide services was not authorized because the same service could
be provided by an in-network provider.  The
trial court granted summary judgment in favor of appellees.

          QIC
contends the trial court erred in granting summary judgment for appellees on
its fraud, fraudulent inducement, negligent misrepresentation, and tortious
interference with existing and prospective business relations claims because it
presented more than a scintilla of evidence to support each element of every
claim.[14]  All of QIC’s tort claims are predicated on
its assumption that the contract makes it a network provider.  For instance, with respect to its fraud
claims, QIC asserts that “the language in Articles 1 and 14, and the repetitive
use of the term ‘Provider[,]’ is . . . a direct representation to QIC that it
is an ‘in-network provider.’”  Similarly,
QIC asserts that its negligent misrepresentation claim “is based upon the same
representations, which form the basis of QIC’s fraud claim. . . .  The representations made in the Contract were
. . . that the Contract made QIC an ‘in-network provider.’”  With respect to its tortious interference
claims, QIC maintains that appellees willfully and intentionally interfered
with its existing and prospective business relationships by sending letters to
its patients and referral sources advising them that QIC is not an in-network
provider.[15]

          The
Texas Supreme Court has recently determined, however, that we may consider the
trier of fact’s later findings in a breach of contract case in determining the
propriety of the trial court’s earlier grant of summary judgment on related
bad-faith and extra-contractual claims.  Progressive
County Mut.
Ins. Co. v. Boyd, 177 S.W.3d 919, 920 (Tex.
2005).  Progressive involved an
insurance coverage dispute.  Id.  The
appellant, Boyd, was involved in an automobile accident and submitted a claim
to his insurance carrier, Progressive, for uninsured motorist benefits.  Id.  Progressive denied the claim and Boyd sued,
alleging breach of contract, DTPA and Insurance Code violations concerning the
alleged bad-faith denial of his claim, and conversion.  Id.

          The
trial court granted summary judgment on all of Boyd’s extra-contractual claims,
which had been severed from the breach of contract claim.  Id.  Three months later, the breach of contract
claim was tried to a jury.  Id.  After
the jury found that Boyd had not been involved in an accident with an uninsured
vehicle, the trial court entered a take-nothing judgment in favor of
Progressive.  Id.

          On
appeal, our court affirmed the breach of contract judgment, but reversed the
summary judgment on the extra-contractual claims, noting that summary judgment
cannot be affirmed on grounds not raised in the trial court, and the jury’s breach
of contract finding was not before the trial court at the time it granted the
summary judgment.  Id.
at 921.  We therefore held that there was
a fact issue on Boyd’s common-law bad-faith claim.  Id.

          The
Texas Supreme Court reversed, concluding that “the jury’s findings may be
considered on appeal.”  Id.  It noted that Boyd’s pleadings made clear
that all of his claims were predicated on his insurance policy and the accident
being covered under the insurance policy. 
Id. at 920.  Thus, the court concluded, “even if the trial
court erred by granting summary judgment as to the bad-faith and
extra-contractual claims, the error was harmless because the jury finding in
the breach of contract case negated coverage of the occurrence by Progressive’s
insurance policy.”  Id.  In reaching its conclusion, the court noted
that “a trial court is not required to vacate a summary judgment and then
reinstate it to accomplish the same end.” 
Id. at 921.

          Like
the supreme court, we conclude that, because all of QIC’s tort claims are predicated
on its assumption that the contract makes it a network provider, and because
the trial court later concluded after a bench trial that the contract does not
make QIC a network provider, we may consider the trial court’s subsequent
finding in determining the propriety of the summary judgment on the tort
claims.  Hence, “even if the trial court
erred by granting summary judgment as to the [tort] claims, the error [i]s
harmless because the [trial court’s] finding in the breach of contract case negated
[QIC’s assertion that it is a network provider, which formed the predicate for
QIC’s tort claims].”[16]  Id.
at 920.  As the supreme court noted, “a
trial court is not required to vacate a summary judgment and then reinstate it
to accomplish the same end.”  Id. at 921. 
We therefore affirm the no-evidence summary judgment.

CONCLUSION

          We
conclude that the trial court properly held that QIC take nothing on its breach
of contract claim because the contract does not make QIC a network provider and
does not entitle QIC to be reimbursed at its standard retail rates.  We further conclude that QIC has not shown
that the trial court erred in granting summary judgment for appellees on QIC’s
tort claims.  With respect to appellees’
counterclaim for breach of contract, we conclude that the trial court correctly
determined that QIC breached the contract by failing to return certain overpayments
to appellees.  Moreover, the trial court
properly awarded appellees their attorney’s fees.  Appellees confess, however, that the final
judgment contains an error in calculation regarding the total amount of the
overpayments.  We therefore modify the
judgment of the trial court to reflect that the overpayments total $23,202.87,
and affirm the judgment as modified.

 

 

                                                          Jane
Bland

                                                          Justice

 

Panel consists of Chief Justice
Radack and Justices Alcala and Bland.











[1] Specifically, QIC challenges Findings of Fact Nos. 3,
4, and 6–14 and Conclusions of Law Nos. 2–17.





[2] QIC asserts that Article 14 of the contract, which
states that “[t]he Provider may refer to its status as a Provider contracting
with BCBSTX in advertising or descriptions of its services[,]” lends support to
its interpretation that it is an in-network provider.  We disagree. 
Article 14 merely states that QIC may, in advertising its services,
refer to itself as a “Provider”—the provision does not say that QIC may refer
to itself as an “in-network provider.” 
As such, Article 14 is of no aid in discerning the meaning of the term
“Provider.”

 





[3]
See
Finding of Fact No. 5.





[4] QIC also asserts that we should construe the contract
against appellees, since they drafted the contract.  “The principle of construing a contract
against its drafter . . . is to be used only as a last resort[,]” however.  GTE Mobilnet of S. Tex. Ltd. P’ship v.
Telecell Cellular, Inc., 955 S.W.2d 286, 291 (Tex. App.—Houston [1st Dist.]
1997, pet. denied); see also Forest Oil Corp. v. Strata Energy, Inc.,
929 F.2d 1039, 1043 (5th Cir. 1991) (“[A] contract generally is construed
against its drafter only as a last resort—i.e., after the application of
ordinary rules of construction leave a reasonable doubt as to its
interpretation.”).  Here we need not
resort to construing the contractual language against appellees because the
extrinsic evidence discussed above makes clear that the parties did not intend
for “Provider” to mean “in-network provider.”





[5] The patients at issue are listed in Finding of Fact
No. 5.





[6] QIC stipulated that appellees’ records show that all
of the patients for whom appellees refused to precertify treatment do not have
out-of-network benefits.

 

 





[7] The parties stipulated that “[t]here are two slightly
different versions of the contract,” Agreed Exhibits 1 and 1A.  Agreed Exhibit 1, which is the only contract
QIC contends it signed, contains only one Exhibit A, the language of which is
quoted above (i.e., the exhibit refers to HMO Blue throughout).  Appellees, on the other hand, contend that
they signed Agreed Exhibit 1A, which contains two Exhibit As—one of which
refers to HMO Blue and one of which refers to BCBSTX.  In all other respects, the two contracts are
identical.

            QIC asserts that,
because the Exhibit A that is attached to Agreed Exhibit 1 only references HMO
Blue, and not BCBSTX, “any limitations contained in the Exhibit A[] do not
apply to BCBSTX, and cannot limit the amounts recoverable by QIC for treatments
rendered to BCBSTX insureds.”  The trial
court did not decide which version of the contract controls.  Assuming without deciding that Agreed Exhibit
1 (QIC’s version) controls, we nonetheless reject QIC’s argument.  Although the Exhibit A that is attached to
Agreed Exhibit 1 references only HMO Blue, the attached fee schedule is
entitled “Blue Cross Blue Shield of Texas Home Infusion Therapy Fee Schedule.”  Moreover, Article 2A of the contract that
comprises Agreed Exhibit 1 expressly provides that “[t]he reimbursement
mechanism which will be used as the basis for payment of Covered Services by BCBSTX
to the Provider is a part of the Contract and will be as described in the
Exhibit(s) attached to this Contract.”  (Emphasis
added).  Article 6B adds that “BCBSTX
. . . shall [not] be liable for payment of . . . any sum based upon charges
made at rates in excess of those stipulated in the attached Exhibit(s).”  (Emphasis added).  The only exhibit that is attached to Agreed
Exhibit 1 is Exhibit A.  Accordingly, the
limitations set forth in Exhibit A apply to BCBSTX, even though the exhibit
primarily references HMO Blue.  Any other
interpretation would render the language of Articles 2A and 6B
meaningless.  See Coker v. Coker,
650 S.W.2d 391, 393 (Tex.
1983) (“[C]ourts should examine and consider the entire writing in an
effort to harmonize and give effect to all the provisions of the
contract so that none will be rendered meaningless.”) (emphasis in original).

 





[8]
Specifically, QIC challenges Conclusions of Law
Nos. 7 and 8.

 





[9] QIC’s standard retail price becomes relevant in
determining the subscriber’s share of the cost of infusion therapy
services.  That is, under Article 6A, QIC
“will base the Subscriber’s share of the cost on [its] standard retail price or
the BCBSTX allowable amount as set forth in . . . Exhibit [A], whichever is
less.”  Thus, in the event QIC’s standard
retail price is lower than the Exhibit A rate for a particular service provided
to any given patient, that patient’s share of the cost will be calculated using
QIC’s standard retail price instead of the Exhibit A amount.

 





[10] The overpayments involve claims that QIC submitted for
the patients identified in Findings of Fact Nos. 6, 7, 12, and 13 and
Conclusions of Law Nos. 11–13.

 





[11] The error relates to claims QIC submitted for the
patients identified in Finding of Fact No. 6 and Conclusion of Law No. 11.

 





[12]
Appellees did not file their counterclaim until
July 2004.

 

 





[13] QIC also complains that “[t]here is no evidence
[appellees] presented to QIC an amount that [they] would have accepted to
resolve their claims.”  A claimant,
however, “is not required to make a demand of the exact amount it is entitled
to recover.”  West Beach Marina, Ltd.
v. Erdeljac, 94 S.W.3d 248, 269 (Tex.
App.—Austin 2002, no pet.) (rejecting appellant’s argument that, because
appellees never asked for exact amount that was allegedly due, presentment was
not satisfied).





[14] QIC does not challenge the summary judgment concerning
its constructive fraud claim and therefore has waived any error.  See Pat Baker Co. v. Wilson,
971 S.W.2d 447, 450 (Tex. 1998); Vawter v.
Garvey, 786 S.W.2d 263, 264 (Tex. 1990); Allright,
Inc. v. Pearson, 735 S.W.2d 240, 240 (Tex. 1987).

 





[15] QIC attached only two letters to its summary judgment
response—both of which are letters that appellees sent to two of their
subscribers, not hospitals or clinics or doctors—in which appellees advise the
subscribers that the request for QIC to provide services was not authorized because
the same service could be provided by an in-network provider.

 





[16] During the bench trial, counsel for QIC reminded the
trial court that “[t]here were initially other claims by Summary Judgment
Motions, if the Court will remember, ruling against all of our tort claims and
leaving in the contract claims.  And the
Court [ha]s stated that it sees this case as a contract case.  We do, too.”